UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

CROWN BRIDGE PARTNERS, LLC,

        Plaintiff,

-against-                                 18 Civ. 7632 (CM)

SUNSTOCK, INC.

        Defendant.

---------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND DIRECTING DEFENDANT TO RETAIN COUNSEL

McMahon, C.J.:

    This case presents an issue that has arisen before my colleagues with greater frequency over the past few years, but it is one of first impression for this particular Court: Namely, the increasing use of "death spiral" financing to fund small public companies—a form of financing that is aided, in part, by companies' exploiting choice-of-law clauses to avail themselves of jurisdictions (to which they otherwise have no connection) that do not have laws prohibiting usury.

    This is an action for breach of a convertible promissory note. In late 2017, Defendant Sunstock, Inc. ("Sunstock") issued a convertible promissory note (the "Note") to Plaintiff Crown Bridge Partners, LLC ("Crown Bridge") in exchange for $58,500. The Note granted Crown Bridge the right to convert any portion of the money owed on the Note to shares of Sunstock common stock. Crown Bridge alleges that Sunstock has breached the Note by, among other things, refusing to honor Crown Bridge's exercise of its conversion right, and is therefore owed

1

Copies mailed /faxed/handed to counsel on 6/3/19

the entire proceeds due under the Note—including accrued interest, reasonable attorneys' fees, damages, and other costs—which exceeds $100,000.

Sunstock now moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the complaint on the basis that the Note is void *ab nitio* because it violates New York's criminal usury statute.

For the reasons that follow, Sunstock's motion is **DENIED**.

I. **Factual Background**

   a. **Description of "Death Spiral" Financing**

Before turning to the particulars of this case, a brief primer on the concept of "Death Spiral Financing" is in order.

The investment education website "Investopedia" characterizes the type of convertible debt instrument at issue in this case as a form of "death spiral" financing, because the stock of the company that enters into this type of arrangement "often plunges drastically[.]" *Death Spiral*, Investopedia, http://www.investopedia.com/terms/deathspiral.asp.

Death spiral financing is a form of last resort for cash-strapped, "small-cap"[1] public companies. The process is relatively straightforward. Under these arrangements, the lender is given the right to convert the debt it holds into shares of common stock belonging to the lender. *Id.* While conventional convertible debt arrangements permit the lender to convert the debt into a fixed number of shares, a "death spiral" financing arrangement permits the lender to convert the debt into a fixed value. If the lender exercises her right of conversion, the stock price will almost certainly drop, because the supply of shares available for purchase in the market increases. This, in turn, gives the lender a greater inventive to convert more shares, because it "can obtain—and then sell—even more shares of the stock with the fixed value feature." *Id.*

---

[1] A "small cap" company is generally defined as a company whose market capitalization is below $1 billion.

When all is said and done, the lender's stock price can drop to or near a zero-dollar value. And the death spiral is complete.

### b. The Parties

Sunstock, a publicly traded small cap company, is Delaware corporation with a principal place of business in California. (Complaint ("Compl."), dated August 22, 2018, ¶ 4, Dkt. No. 1.)

Crown Bridge is a New York limited liability company with a principal place of business in New York. (Compl. ¶ 3.) None of Crown Bridge's constituent corporate members is a citizen of Delaware of California. (*Id.* ¶ 5.)

### c. Parties Enter into the Note

On December 8, 2017, Sunstock issued the Note in the principal amount of $65,000 to Crown Bridge in exchange for $58,500. (Compl. ¶ 7–8; *see also id.* Ex. A (the Note).) Put otherwise, Sunstock received $58,500 from Crown Bridge, with an original issue discount ("OID") of $6,500.[2] The Note bore interest at the stated rate of 8% per annum and matured one year after the issuance date, *i.e.*, on December 7, 2018. (*Id.* ¶¶ 8–9.)

Certain features of the Note bear summarizing.

#### i. Prepayment

The Note granted Sunstock the right to "prepay" the loan within the first 180 days of the date of the transaction—subject to a prepayment penalty. (*Id.* Ex. A. § 4.9.) If Sunstock prepaid

---

[2] Investopedia describes an OID as follows:

> The OID is the difference between the price a [debt instrument] is sold at and the [instrument's] actual face value, also known as par. The OID may be seen as a form of interest, since the buyer receives the face value of the bond even though he paid less than par when it was purchased. In contrast to regular interest rates on a bond, this form of interest is not calculated or paid on a monthly basis. Instead, it is only awarded as a total sum, along with the principal invested, at the time of maturity.

*Original Issue Discount—OID*, Investopedia, https://www.investopedia.com/terms/o/oid.asp.

3

the debt during the first 60 days after the transaction date, it would have to pay Crown Bridge 1.35 times the principal amount plus interest, "subject to [Crown Bridge]'s prior written acceptance" at Crown Bridge's sole discretion. (*Id.*) If Sunstock prepaid at any time from days 61 to 180, it would owe Crown Bridge 1.5 times the principal under the Note (again, subject to Crown Bridge's written approval). (*Id.*) Sunstock could not prepay after day 180. (*Id.*)

### ii.   Conversion

The Note granted Crown Bridge the right to convert "at any time" any portion of the Note—both the outstanding and unpaid principal amount as well as all accrued and unpaid interest—to shares of Sunstock's common stock. (*Id.* Ex. A. § 1.1.) The conversion price "shall mean 55% multiplied by the Market Price"—defined as the "lowest (1) Trading Price for the Common Stock during the twenty-five (25) Trading Day period ending on the last complete Trading Day prior to the Conversion Date"—"representing a discount rate of 45%." (*Id.* Ex. A. § 1.2.)

In order to secure Crown Bridge's right of conversion, the Note required Sunstock to "reserve from its authorized and unissued Common Stock a sufficient number of shares . . . to provide for the issue of Common Stock upon the full conversion of this note." (*Id.* Ex. A. § 1.2(b).)

The Note also outlined the "Method of Conversion," should Crown Bridge seek to exercise that right. (*Id.* Ex. A. § 1.3.) Namely, it required Crown Bright to submit to Sunstock a "Notice of Conversion," using a model form attached to the Note, "by facsimile, email, or other reasonable means of communication[.]" (*Id.* Ex. A. § 1.3(a).) Upon receiving Crown Bridge's Notice of Conversion, Sunstock was required to deliver to Crown Bridge within two business days all certificates of common stock that corresponded to the conversion. (*Id.* Ex. A. § 1.3(d).)

This "obligation to issue and deliver the certificates for Common Stock [was] absolute and unconditional." (*Id.* Ex. A. § 1.3(e).) If Sunstock did not deliver the common stock to Crown Bridge in a timely fashion, Sunstock would be obligated to pay Crown Bridge a penalty of $2,000 per day for each day that it failed to honor its conversion obligation. (*Id.* Ex. A. § 1.3(g).)

### iii. Default

The Note enumerated a number of "Events of Default." (*Id.* Ex. A. § 3.) As relevant here, Section 3.2 outlined one such event, providing that an event of default "shall occur" where:

> [Sunstock] fails to reserve a sufficient amount of shares of common stock as required under the terms of this Note . . . and such breach continues for a period of five (5) days, fails to issue shares of Common Stock to [Crown Bridge] . . . upon exercise by [Crown Bridge] of the conversion rights . . . in accordance with the terms of this Note, [or] fails To transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) shares of Common stock issued to [Crown Bridge] upon conversion of or otherwise pursuant to this Note as when required by this Note[.]

(*Id.* Ex. A. § 3.2.) A second default event "shall occur" where Sunstock "replaces its transfer agent, and the Borrower fails to provide[,] prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions," which was to be signed both by Sunstock and the new transfer agent. (*Id.* Ex. A. § 3.13.)

The Note provides that Sunstock is obligated to pay 150% of the outstanding principal and interest if any event of default occurs, plus interest, legal fees, and other costs. (*Id.* Ex. A. § 3.16; *see also id.* Ex. A. § 4.5 (obligating Sunstock to pay Crown Bridge "costs of collection, including reasonable attorneys' fees," "[i]f default is made in the payment of this Note").)

### d. "Miscellaneous" Provisions

Finally, the Note contains two "miscellaneous" provisions that are of particular import here.

First, the Note calls for application of Nevada state law. (*Id.* Ex. A. § 4.6.)

5

Second, the Note contains a usury savings clause, which states that if "any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law." (*Id.* Ex. A. § 4.10.)

### e. Appointment of Globex as Transfer Agent

On December 8, 2017—the same date that the parties entered into the Note—Sunstock and Globex Transfer, LLC ("Globex") executed an irrevocable transfer agent instruction letter, pursuant to which Globex would serve as the transfer agent on the Note. (*Id.* ¶¶ 23–24.) This agreement provided that Sunstock would "cause Globex to 'reserve a sufficient number of shares of common stock ('Common Stock') of [Sunstock] (initially, 11,363,636) for issuance upon conversion of the Note in accordance with the terms hereof.'" (*Id.* ¶ 25.)

### f. Sunstock Terminated its Relationship with Globex and Appoints a New Transfer Agent

On or about June 11, 2018, Crown Bridge learned that Sunstock had terminated its relationship with Globex (on some unspecified date) and enlisted VStock Transfer, LLC ("VStock") to serve as a successor transfer agent on the Note. (*Id.* ¶ 26.) Sunstock did not notify Crown Bridge that it had terminated its relationship with Globex. (*Id.* ¶ 27.) Nor did it obtain from VStock fully executed irrevocable transfer agent instructions, in accordance with Section 3.13 of the Note, before replacing Globex. (*Id.* ¶ 30.)

### g. Crown Bridge Exercises its Conversion Right

On June 15, 2018, Crown Bridge submitted to Sunstock a Notice of Conversion, seeking to convert a portion of the Note—specifically, $5,854.26 of the principal amount and $500 of fees—into 3,398,000 shares common stock, which represented a conversion price of $.000187 per share. (*Id.* ¶ 15; *see also id.* Ex. B (Crown Bridge's Notice of Conversion).)

Crown Bridge alleges that Sunstock refused to honor the conversion "[w]ithout cause or justification," despite the fact that Crown Bridge has complied with all provisions of the Note, including those governing the method for effecting a proper conversion. (*Id.* ¶¶ 16–17.)

Crown Bridge then informed Sunstock that it believed that Sunstock breached—both by failing to honor Crown Bridge's right of conversion and by failing to notify Crown Bridge that it changed transfer agents—but Sunstock did not cure either of these alleged issues. (*Id.* ¶¶ 21, 32.)

On July 10, 2018, a Crown Bridge representative sent a letter to Sunstock, which stated that Sunstock was in default of its obligations under the Note. (*Id.* ¶ 35.) Crown Bridge requested that Sunstock immediately contact Crown Bridge "and demonstrate its compliance with the material requirements under the Note." (*Id.*) After not receiving a response from Sunstock, counsel for Crown Bridge again sought to contact Sunstock, warning it that it would file suit unless Sunstock complied with the Note. (*Id.* ¶ 36.) Sunstock did not respond. (*Id.*)

This lawsuit followed.

### h. The Complaint

Crown Bridge asserts two causes of action.

*First*, it alleges that Sunstock breached the Note by failing to comply with, among other provisions, Section Sections 1.2(b) (reservation of shares), 1.3(d) (Delivery of Common Stock Upon Conversion), 1.3(e) (Obligation of Borrower to Deliver Common Stock), 1.3(f) (Delivery of Common Stock by Electronic Transfer), 1.3(g) (Failure to Deliver Common Stock Prior to Deadline), 3.1 (Failure to Pay Principal and Interest), 3.2 (Conversion and the Shares), 3.3 (Breach of Covenants), 3.4 (Breach of Representations and Warranties), and 3.13 (Replacement of Transfer Agent). (*Id.* ¶ 45 (Count I).)

*Second*, it alleges that Sunstock is liable for unjust enrichment, because it has received a benefit from Crown Bridge without providing a benefit of equal value, and that it would be inequitable for Sunstock to retain this benefit without penalty. (*Id.* ¶¶ 48–53 (Count II).)

Crown Bridge seeks damages in excess of $100,000, plus interest, costs, and attorneys' fees. (*Id.* ¶¶ 47, 54.)

Sunstock now moves to dismiss the complaint.

## II.      Sunstock's Motion to Dismiss is Denied

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted). The complaint will survive a motion to dismiss as long as it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Claimants must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

In addition to the text of the complaint, the Court may consider documents that are appended as exhibits, incorporated by reference, or are otherwise "integral" to the allegations contained therein. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Because the Note and Notice of Conversion are appended as exhibits and integral to the Complaint, the Court can consider those items on the present motion. The Court need not accept the parties' characterizations of those items, but any ambiguities must be resolved in Crown Bridge's favor.

Sunstock moves to dismiss the Complaint on the basis that the "true" interest rate provided for in the Note well exceeds 25%, in violation of New York law, which provides that a loan is criminally usurious when the lender "charges . . . as interest on the loan . . . a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." N.Y. Penal L. § 190.40. Thus, it argues, the transaction is void *ab initio* as a matter of law, pursuant to N.Y. Gen. Oblig. L. § 5-511.

Sunstock's motion raises a number of interesting questions, including whether (*i*) the Note's choice of law clause, which calls for application of Nevada law, is enforceable; (*ii*) the Note qualifies as an "investment"—which would mean it was not subject to any usury laws; (*iii*) corporations can assert a criminal usury defense; (*iv*) the Note is structured such that its has an effective interest rate exceeding 25%; and (*v*) the Note should be voided in its entirety or revised to provide for a non-usurious rate, assuming it does indeed violate usury laws.

Unfortunately, the Court cannot reach any of these questions at this juncture, because Sunstock's motion is premature.

"'Usury is an affirmative defense and a heavy burden rests upon the party seeking to impeach a transaction for usury.'" *Coastal Inv. Partners, LLC v. DSG Glob., Inc.*, No. 17 CIV. 4427 (DAB), 2018 WL 2744719, at *4 (S.D.N.Y. June 6, 2018) (quoting *Hillair Capital Investments, L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013)). A usury defense requires evidence that the plaintiff "knowingly" charged an interest in excess of the legal rate on a loan or forbearance. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F. Supp. 3d 339, 352 (S.D.N.Y. 2018) (internal citation and quotation marks omitted); *see also Mallis v. Bankers Trust Co.*, 615 F.2d 68, 77 2d Cir. 1980).

9

"When a note is not usurious on its face, a court will not presume usury; rather, the party asserting the defense must prove all the elements[.] *LG Capital Funding, LLC v. ExeLED Holdings Inc.*, No. 17 Civ. 4006 (RJS), 2018 WL 6547160, at *5 (S.D.N.Y. Aug. 28, 2018) (internal quotation marks omitted). Critically, an important element of the affirmative defense of usury is the lender's usurious intent. *Id.* Intent is a question of fact and "'will not be presumed where a note states a legal rate of interest." *Union Capital LLC v. Vape Holdings Inc.*, No. 16 CIV. 1343 (RJS), 2017 WL 1406278, at *4 (S.D.N.Y. Mar. 31, 2017) (quoting *Concord Fin. Corp. v. Wing Fook, Inc.*, No. 96-cv-5293 (DLC), 1997 WL 375679, at *5 (S.D.N.Y. July 7, 1997)).

On its face, the Note bears an interest rate of 8%. Determining the "effective" rate of the Note is a question of fact that will require the Court to examine Crown Bridge's intent—an inquiry that is not appropriate at this early stage of the proceeding, especially since the Court must draw all inferences in favor of the non-movant.

*Adar Bays, LLC v. Aim Expl., Inc.*, No. 17-CV-1290 (VM), 2017 WL 2304022 (S.D.N.Y. May 12, 2017) is instructive. In that case, the defendant submitted a letter to his adversary in which he contemplated filing a motion to dismiss the complaint on the exact grounds alleged here—that the note upon which the plaintiff's claims were based was "'criminally usurious' and therefore 'void and unenforceable under New York law.'" *Id.* at *1. Construing the defendant's letter as a motion to dismiss on the basis of the affirmative defense of usury, the court denied the motion, because the defendant "ha[d] not yet answered the First Amended Complaint." *Id.* Accordingly, the court stated, "a motion to dismiss on the basis of the affirmative defense of usury, a defense which is not yet on record, is premature." *Id.*

10

That principle of law applies here with equal force. This is especially so considering that most of the cases cited in the parties' briefs, in which courts have engaged in a substantive usury analysis, came about on motions for summary judgment. *See, e.g.*, *Beaufort Capital Partners LLC v. Oxysure Systems, Inc.*, No. 16 Civ. 5176 (JPO), 2017 WL 913791 (S.D.N.Y. Mar. 3, 2017); *Blue Citi, LLC v. 5Barz Intern., Inc.*, 338 F. Supp. 3d 326 (S.D.N.Y. 2018); *LG Capital Funding LLC v. 5Barz Intern., Inc.*, 307 F. Supp. 3d 84 (E.D.N.Y. 2018).

In response, Sunstock cites *Rothstein v. Isolation Film LLC*, 2017 U.S. Dist LEXIS (S.D.N.Y. Mar. 22, 2017) for the proposition that, "Federal District Courts have also held that a pre-answer motion to dismiss based on the defense of usury is proper." (Def.'s Reply Mem. in Support of Mot. to Dismiss ("Defs.' Reply") at 3, dated Oct. 25, 2018, Dkt. No. 18.) In *Rothstein*, however, the interest rate on the loan—50% on an annualized basis—was facially usurious. *Id.* at *3. Here, by contrast, Sunstock's theory of usury is that the Note's stated 8% interest rate was illusory. This calls upon the Court to consider, among other things, Crown Bridge's intent, and therefore engage in a fact-based inquiry. That inquiry is better suited for a later stage of litigation.

The Court denies Sunstock's motion to dismiss.

### III. Case Developments Since Sunstock Filed its Motion to Dismiss

After briefing Sunstock's motion to dismiss, the parties sought—unsuccessfully—to settle the case.

Then, on March 11, 2019, counsel for Sunstock moved to withdraw as attorney after Sunstock's CEO informed counsel by email that, "Sunstock, Inc. has no more money to fund the litigation with Crown Bridge, [and] we're therefore terminating the firm representation of us for this matter as we can no longer afford the litigation." (Dkt. No. 30 Ex. 2.) Two days later, the Court granted counsel's proposed order, permitting him to withdraw as Sunstock's attorney.

That order provided that Sunstock "shall have 30 days from the date of this order to retain substitute counsel or otherwise face default." (Dkt. No. 31.)

More than thirty days have passed since the entry of that order, and Sunstock has not retained new counsel. Accordingly, it is at risk of default.

Crown Bridge filed for summary judgment on April 3, 2019. (Dkt. No. 32.) However, because Sunstock, as a corporation, cannot proceed *pro se*, the Court will not consider that motion. *See Commonwealth Advisors Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 15-CV-7834 (JMF), 2016 WL 3542462, at *3 (S.D.N.Y. June 23, 2016) ("It is well established that 'a corporation, which is an artificial entity that can only act through agents, cannot proceed *pro se*.'") (quoting *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983)).

Sunstock has seven days from the date of this order to retain new counsel and twenty-one days thereafter to respond to Crown Bridge's motion. If Sunstock cannot afford counsel, it should submit a letter to the Court to that effect. If Sunstock cannot retain counsel within seven days (or if it simply does not respond to this order), Crown Bridge is directed to move for default judgment, pursuant to Fed. R. Civ. P. 55.

## CONCLUSION

For the reasons stated above, Sunstock's motion to dismiss is denied. The Clerk of Court is directed to close Dkt. No. 21.

It is so ordered.

Dated: June 3, 2019

_____
Chief Judge

BY ECF TO PLAINTIFF'S COUNSEL
BY DIRECT MAIL TO DEFENDANT